# AFFIDAVIT

Nicholas Nimeskern, first being duly sworn, deposes and says:

1. I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA) in the Cincinnati Resident Office (DO) and have been since 2019.

2. I have been a police officer since 2003 and am currently employed with the City of Montgomery Police Department. I was previously assigned to D.A.R.T. Drug Abuse Reduction Task Force for several years prior to being assigned to the DEA. As a Task Force Agent with the DEA, my duties include the investigation of violations of federal law concerning the importation, manufacture, possession, and distribution of controlled substances as defined by Title 21, United States Code, Section 841 including controlled substances such as heroin, fentanyl, cocaine, methamphetamine, marijuana, illicitly diverted pharmaceuticals, and other dangerous drugs. During my current assignment with the DEA, I have specialized in investigations involving narcotics trafficking and numerous criminal offenses, including those involved in the current investigation. I have received specialized training on the subject of narcotics trafficking and money laundering from the DEA and have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. Since that time, I have primarily been assigned investigations dealing with the importation and distribution of illegal drugs, which includes cocaine, "crack" cocaine, heroin, fentanyl, marijuana, methamphetamine, crystal methamphetamine, and 3, 4-

methylenedioxy-methamphetamine (otherwise known as MDMA or "Ecstasy"). During those investigations, I have conducted physical surveillance, electronic surveillance, and wire surveillance. I have also arrested numerous individuals for various drug violations and have spoken with numerous drug dealers, gang members, and informants concerning the methods and practices of drug traffickers. These investigations have also included the unlawful importation, possession with intent to distribute and distribution of illegal substances, the related money laundering instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses. These investigations have resulted in the seizure of narcotics, arrests of suspects, their prosecution, conviction, and the seizure of large amounts of U.S. currency; seizure of real property; and have involved the use of confidential informants; undercover agents; the analysis of pen registers, trap and trace devices, and toll records; physical surveillances and the execution of search warrants and arrest warrants. I have also testified in grand jury proceedings, suppression hearings, jury trials, and have written reports and analyzed documents in the course of investigations.

3. Based on my training and experience, I recognize that individuals involved in drug related activities often place assets, like cell phones, residences, storage units and vehicles, in names other than their own to avoid detection by law enforcement. Even though these assets are in other people's names, the offenders continue to use these assets and maintain control over them. I am also aware that these

2

individuals often utilize storage units to hide their illegal wares from law enforcement and that these storage lockers are often rented in other people's names. I am further aware that drug traffickers commonly use multiple cellular telephones to conduct their illicit activities. Said cellular telephones are often rotated and/or replaced with new cellular telephones on a regular basis in order to remain undetected by law enforcement.

4. I have learned through training and experience that drug traffickers and their couriers often fly on one-way tickets and usually do not make travel plans much in advance because they get last second information that the narcotics are ready or instructions and they have no idea how long the transaction will take.

5. The information in this Affidavit is based on my personal investigation and does not include all information obtained during this investigation, rather only that believed necessary to provide a legal basis for the civil forfeiture.

6. On September 28, 2022, agents from the DEA Cincinnati Resident Office received information that Antonio Streety was traveling from Cincinnati to Los Angeles on a suspicious flight itinerary: his one-way airline ticket was purchased one (1) day before travel; and he was traveling to a known source city/state.

7. I responded to the departure gate accompanied by TFO Eli Sautter, TFO Rick Bernecker, and Corporal Joe Moyer to await the departure of the flight to Los Angeles. Streety was identified when his ticket was scanned. TFO Bernecker and I approached him and identified ourselves as a police officers. During the

consensual encounter, Streety was standing in the entrance of the jet-way, free to walk away at any time.

8. Upon request, Streety presented an Ohio driver's license confirming his identity. I explained that the accompanying officers and I are part of an interdiction team looking for large sums of money and/or drugs related to narcotics and/or terrorism. I asked Streety how much currency, if any, he was traveling with and he replied "twenty." I asked for clarification and Streety replied, "like twenty thousand." I then asked for permission to search his person and backpack and Streety replied "yes," verbally consenting to the searches.

9. TFA Bernecker then conducted a search of Streety's person and Cookies brand backpack. (These backpacks are promoted online featuring smell-proof technology designed to keep smells locked inside, double zippers lined with rubber and a poly canvas outer making for a durable smell proof bag, some styles with hidden zippered pouches.) In the backpack, a white envelope was located that contained large stacks of U.S. currency in between clothing items. The envelope also contained a Wright-Patt bank receipt dated August 3, 2022, nearly two months prior to my encounter with Streety, showing withdrawal of $23,000.00 and a balance of $258.39.

10. I asked Streety if he filed taxes last year and for how much, and he replied, "I don't think I did." I then asked if the cash he was traveling with came from a bank and Streety replied, "most of it." I advised him that it appeared to be more than $20,000.00 and Streety responded that maybe it was closer to $25,000.00.

11. I next asked Streety if he is currently employed and he replied, "yeah ima rapper." I asked what his rap name was, and he replied, "TRE." I asked Streety how they pay him for his music, and he replied, "cash and CashApp." When asked if he has a business account he replied, "yes." However, when asked for the name of the LLC he replied, "I can't remember at the moment." When asked where he banks, he replied, "just Wright-Patt," and that the current balance in his account was around $100.

12. When asked the purpose of his trip, Streety said he was going to hang out and smoke weed. He had no comment when asked why he was traveling with such a large amount of cash, what he planned on doing with it, and how long he intended to be in California. Streety was asked by agents if his phone contained anything that could verify his employment or a legitimate source for cash he carried, to which he responded, "there is no way I am letting you guys look in my phones."

13. Continuing the interview, I asked Streety directly if agents could look through his two (2) cell phones and he stated, "hell no man." I advised that we were looking for anything tied to the sales of illegal narcotics and that if he would not grant permission for us to look at the content of his phones they would be seized as evidence pending application for a warrant to search them. He continued to refuse, and the phones were seized.

14. I then advised Streety that the cash, later determined to be $26,980.00, would also be seized because agents believe it is tied to illegal narcotics.

5

15. Subsequent to seizure of the phones, officers applied for and obtained a warrant to search their content, which included photos of marijuana and other drugs, large amounts of cash bundled with rubber bands, and a ledger or order form, all indicative of drug trafficking.

16. The $26,980.00 carried by Streety was seized based upon probable cause that it was proceeds of drug-related activity or intended for such use. Several accumulating factors contributed to the officers' belief that there was probable cause that the cash was proceeds of drug-related activities, including:

    a. travel on a recently purchased (1 day) one-way airline ticket to a known source city/state;

    b. a criminal history that includes arrests for drug trafficking and firearms violations and investigation by other law enforcement agencies for involvement in drug trafficking;

    c. dishonesty about how much cash he was carrying;

    d. no proof of a legal source for the cash, including employment;

    e. refusal to state the purpose for carrying a large amount of cash;

    f. admission to not filing a tax return the previous year;

    g. photos on his phones indicative of drug trafficking;

    h. the strong odor of marijuana on his person and belongings; and

    i. positive indication by a drug dog.

17. On or about December 21, 2022, Antonio Streety filed a claim in DEA's administrative forfeiture proceeding to the $26,980.00 seized from him.

For the above-stated reasons, your affiant believes that the seized currency was furnished or intended to be furnished in exchange for controlled substances, was proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics and is, therefore, subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881 (a)(6).

I declare under penalty of perjury, as provided by federal law, that the foregoing statements are true.

This 16TH day of FEBRUARY, 2023.

_____
Nicholas Nimeskern, Task Force Officer
Drug Enforcement Administration